**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| J.Y., *on behalf of herself and all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>TOTAL ACCESS URGENT CARE, P.C.,<br><br>Defendant. | **Case No.** 4:26-cv-2003<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff J.Y. ("Plaintiff")[1] brings this class action lawsuit on behalf of herself and all others similarly situated, by and through undersigned counsel, and hereby alleges the following against Defendant Total Access Urgent Care, P.C. ("Defendant" or "Total Access"). Facts pertaining to Plaintiff and her experiences and circumstances are alleged based upon personal knowledge, and all other facts alleged herein are based upon investigation of counsel and—where indicated—upon information and good faith belief.

## INTRODUCTION

1. This class action lawsuit arises out of Defendant's unlawful use of third-party tracking technologies by advertising giants such as Alphabet, Inc. ("Google") and Microsoft Corporation ("Microsoft") to surreptitiously intercept and disclose its users' private and protected

[1] Plaintiff will file a Motion to Proceed Pseudonymously to protect her health information under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and Missouri law.

communications, including communications concerning highly sensitive personal health information, to third parties without users' knowledge or consent and in direct contravention of Defendant's representation that "[u]sage of a cookie is in no way linked to any personally identifiable information on our site."[2]

2. Total Access owns and operates twenty-seven urgent care clinics in the St. Louis metro area whose "providers treat illnesses and injuries for adults and children, with onsite services such as digital X-ray, CT imaging, lab testing, IV hydration, and stitches."[3]

3. Total Access owns and operates a website, www.totalaccessurgentcare.com (the "Website"), which it encourages patients and prospective patients to use to "Save My Spot" in line at Total Access's walk-in clinics, access medical records, pay bills, learn about insurance and other payment methods, find locations, learn about Total Access's services, and research treatments and conditions for their health conditions.

4. However, unbeknownst to patients who visited Defendant's Website, their communications about their health care were intercepted and disclosed to third parties through Defendant's use of third-party tracking technologies ("Tracking Tools"). These Tracking Tools intercept users' activity on the website and disclose their communications to third parties, including Google and Microsoft.

5. By intentionally embedding and deploying third-party tracking technologies on the Website, Defendant engages in the unauthorized disclosure of its users' highly sensitive protected health information ("PHI") and personally identifiable information ("PII" and together with PHI,

[2] https://www.totalaccessurgentcare.com/privacy-policy/ (last accessed Nov. 17, 2026)
[3] https://www.totalaccessurgentcare.com/faqs/ (last accessed Nov. 17, 2026)

"Sensitive Health Information") to third parties including, but not limited to, Google and Microsoft. Such disclosures of PHI and PII violate state and federal law.

6. The Tracking Tools embedded on Defendant's Website transmitted the following Sensitive Health Information to third parties without Plaintiff's and each Class Member's authorized consent: (i) their status as patients; (ii) their specific medical conditions; (iii) symptoms they were suffering from; (iv) the specific types of care they were seeking; (v) the location where they were seeking treatment; (vi) that they accessed the "Pay My Bill" page; (vii) that they attempted to access their medical records; (viii) that they have requested information on payment and insurance for medical services; and (ix) the full text of any search they conducted on the Website.

7. Health information is highly regulated by both state and federal law, including HIPAA, which imposes criminal penalties on disclosing individually identifiable health information ("IIHI") to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual[.]" 42 U.S.C. § 1320d-6. Accordingly, Defendant's disclosure of Plaintiff's and each Class Member's Sensitive Health Information constitutes a violation of HIPAA.

8. Defendant installed the Tracking Tools with the purpose of intercepting patients' communications in transit and then disclosing their Sensitive Health Information to third parties, including Google and Microsoft, in violation of HIPAA and common law, including invasion of privacy.

9. Plaintiff and Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their PHI and PII to anyone other than those reasonably believed to be acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiff's and each Class Member's PHI and PII to Google, Microsoft, and other third parties.

10. Given the nature of Google's and Microsoft's business as the world's largest online advertising companies, Plaintiff's and each Class Member's Sensitive Health Information can and will likely be further used by or exposed to additional third parties.

11. Online advertising giants, like Google and Microsoft, compile as much information as possible about American consumers, including information relating to the most private aspects of their lives like their PHI and the diagnostic treatments they use to treat their health conditions. This information is then used as fuel for a massive, targeted advertising enterprise.

12. Thus, any information about a person captured by these online behemoths can be used to stream ads to that person, among other uses. For example, if Google receives information that a person is concerned about their health, it will collect that information and allow its clients to use that information to stream ads related to health treatments and services to that person's computers and smartphones.

13. Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, and Google Tag Manager (collectively, the "Business Tools"). While Google offers these Business Tools to its clients, those clients are the ones that install and specifically configure those tools, including the Tracking Tools at issue here.

14. Armed with Google's Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

15. But, in exchange for access to Google's Business Tools, website operators, like Defendant, install Tracking Tools, *i.e.*, Google's surveillance software, on their website, including tracking pixels ("Pixels") and third-party cookies that capture Sensitive Health Information provided to the website operator by its website users. This sensitive information includes a unique identifier that Google uses to identify that user called a Client ID ("CID"), regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

16. In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

17. Defendant is one of the companies that has chosen to prioritize its marketing efforts and profits over the privacy of its users and potential patients by installing Google's Tracking Tools on its Website with the purpose of intercepting and then disclosing its users' Sensitive Health Information. Defendant intentionally installed the Tracking Tools on its Website and configured the Tracking Tools to unlawfully intercept and disclose its users' Sensitive Health Information to Google. It also configured the Google Tracking Tools to allow Google to use that Sensitive Health Information to send personalized advertisements to its patients based on that Sensitive Health Information.

18. However, Defendant never obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to third parties, including Microsoft as well as Google, the largest advertiser and compiler of user information.

19. As a result of Defendant's conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages; and (vii) continued and ongoing risk to their Sensitive Health Information.

20. Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Defendant: (i) violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.; (ii) Negligence; (iii) Intrusion Upon Seclusion; (iv) Unjust Enrichment; and (v) Breach of Fiduciary Duty of Confidence.

## PARTIES

***Plaintiff J.Y.***

21. Plaintiff J.Y. is a citizen of Missouri, residing in St. Louis, and brings this action both in an individual capacity and on behalf of all others similarly situated.

22. Plaintiff J.Y. utilized the Website on her personal electronic devices beginning no later than February 13, 2026 to save her place in line, complete questionnaires related to her in-person visits, and to research the locations of Total Access's urgent care clinics.

23. Among other interactions with the Website, Plaintiff J.Y.: saved her place in line for a February 13, 2026 appointment at Total Access's Rock Hill urgent care location at 9556 Manchester Rd., St. Louis, MO 63119 and completed an online questionnaire prior to the appointment; and researched treatment options for ear pain in connection with a suspected ear infection and then saved her place in line for an October 30, 2026 appointment at Total Access's Rock Hill urgent care location at 9556 Manchester Rd., St. Louis, MO 63119 and completed an online questionnaire prior to the appointment.

24. Unbeknownst to Plaintiff J.Y., Defendant intercepted in transit the Sensitive Health Information that she communicated while using the Website, including the fact that she saved her place in line for appointments at a particular Total Access location. Defendant then transmitted this information to third parties including Google and Microsoft. Among the Sensitive Health Information that Plaintiff J.Y. disclosed to Defendant, and which was disclosed to third parties including Google and Microsoft, was: (i) her status as a patient; (ii) communications and information related to the ear pain and suspected ear infection for which she sought treatment; (iii) her searches for specific medical conditions and treatment options; (iv) that she saved her place in line for medical appointments; (v) the purpose of those appointments including the specific treatments she sought; and (vi) the location of the Total Access facilities where she received medical care.

25. As a result of Plaintiff J.Y. using the Website, Defendant disclosed to third parties including Google and Microsoft, the information she shared with Defendant through the Website. Defendant also disclosed to third parties Plaintiff J.Y.'s PII, including the disclosure of her CID to Google.

26. Plaintiff J.Y. never authorized Defendant to disclose any aspect of her communications with Defendant through the Website to third parties, including the Sensitive Health Information that she provided to Defendant.

27. On every occasion that she visited the Website, Plaintiff J.Y. possessed an account with Google, and she accessed the Website while logged into her Google account on the same device.

***Defendant***

28. Defendant Total Access Urgent Care, P.C. is a professional corporation organized under the laws of Missouri with its principal place of business at 13861 Manchester Rd., Ballwin, MO 63011-4503, whose registered agent is CSC-Lawyers Incorporating Services Company, 221 Bolivar Street, Jefferson City, MO 65101.

29. Defendant owns, controls, and maintains the Website as well as numerous urgent care clinics located in the Eastern District of Missouri and the State of Illinois operating under the Total Access Urgent Care brand name.

## JURISDICTION AND VENUE

30. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

31. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal law, specifically,

the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

32. This Court has personal jurisdiction over Defendant because Defendant is incorporated in Missouri, is registered to do business in Missouri, regularly conducts business in Missouri, including operating physical locations in Missouri, and because Defendant provided services in this judicial district.

33. Personal jurisdiction is also proper because Defendant committed tortious acts in Missouri and Plaintiff's claims arise out of such acts.

34. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this judicial district in that Defendant made the decision to deploy the Tracking Tools on the Website and because the Defendant resides in this district within the meaning of 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### A. DEFENDANT'S USE OF THIRD-PARTY TRACKING TECHNOLOGIES.

#### i. Google's Mass Advertising Surveillance Operation.

35. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[4] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[5]

[4] *Share of major ad-selling companies in digital advertising revenue in the United States*, Statista (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively.

[5] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, Statista (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-

36. Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[6] But in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[7]

37. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third-party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[8]

38. Google also admits that it uses the information collected from third-party websites, such as the Website, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[9]

39. While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. The vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to

---

search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year.

[6] *Welcome to Google Analytics*, Google, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision.

[7] *See* Aaron Ankin & Surya Mattu, *The High Privacy Cost of a "Free" Website*, The Markup, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites.

[8] *Privacy & Terms – How Google uses information from sites or apps that use our services*, Google, https://policies.google.com/technologies/partner-sites.

[9] *Id.*

think that Total Access was part of Google's surveillance network. Moreover, as Total Access does not disclose its use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Website.

40. Google aggregates the user information that it collects from third-party websites into "advertising profiles" consisting of all of the data that it has collected about a given user.[10] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[11]

41. Google's surveillance of individuals' internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to third-party tracking companies like Google,"[12] and Google trackers are present on 74-percent of all web traffic.

42. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

---

[10] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at* https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[11] *About audience segments*, Google Ads, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics.

[12] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, Scientific American (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/.

a. Twelve of the largest pharmacy providers in the United States send information regarding users' purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[13] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[14]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[15]

c. 93-percent of pornography websites allow third parties, including Google, to collect their users' browsing habits.[16] In fact, Google advertising trackers were found on 73-percent of pornography websites.[17]

43. This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmidt, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[18]

---

[13] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, The Markup (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it.

[14] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, The Markup (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you.

[15] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at* https://pubmed.ncbi.nlm.nih.gov/31002321/.

[16] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at* https://journals.sagepub.com/doi/10.1177/1461444820924632.

[17] *Id.*

[18] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, The Register (Oct. 4, 2010), https://www.theregister.com/2010/10/04/google_ericisms/.

44. In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus. [19]

45. When website operators, like Total Access, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy.

46. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[20]

**ii. Microsoft's Advertising Surveillance Network.**

47. Microsoft operates a similar advertising network known as Microsoft Advertising (formerly known as Bing Advertising), where advertisers pay Microsoft to serve advertisements to "curated lists of customers who have shown purchase intent signals within a particular category, powered by Microsoft audience intelligence signals, including searches and clicks on Bing and page views on Microsoft services."[21]

48. To collect the data that informs this "intelligence," Microsoft encourages website operators, like Total Access, to install Microsoft's Universal Event Tracking ("UET") tag—"a powerful tool that records what customers do on your website."[22]

---

[19] *Analytics Overview*, Google, https://marketingplatform.google.com/about/analytics/ ("Google Analytics gives you the tools, free of charge")
[20] *Id.*
[21] https://about.ads.microsoft.com/en/tools/performance/audience-targeting
[22] https://about.ads.microsoft.com/en/tools/performance/conversion-tracking

49. The UET tag "helps Microsoft Advertising measure user activity and conversion events," "such as making a purchase, submitting a form, signing up for a service, or completing another valuable business action."[23]

50. Microsoft promises website operators that, by installing the UET tag, they will be able to "maximize returns," "maximize conversions," and engage in "precise audience targeting."[24]

51. The UET collects PII from users, including the user's IP address, a "GUID assigned to the user's browser," and, if the user is signed into a Microsoft account, a unique "ID assigned to a user."[25]

52. The data Microsoft collects through UET tags across the Internet is combined with numerous data sources, including users' Bing search usage and LinkedIn profiles, to create comprehensive profiles of users.[26]

**iii. Pixels Can Record Almost Every Interaction Between a User and a Website.**

53. In order to use Google's Business Tools and Microsoft's advertising network, Total Access installed the Tracking Tools, including tracking Pixels, onto the Website.

54. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize

[23] https://about.ads.microsoft.com/en/tools/performance/conversion-tracking#faq-4
[24] https://about.ads.microsoft.com/en/tools/performance/conversion-tracking
[25] https://help.ads.microsoft.com/apex/index/3/en/53056/
[26] https://about.ads.microsoft.com/en/tools/performance/audience-targeting

the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[27]

55. Pixels can collect a remarkable amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form—all transmitted in real-time as the user navigates a website.[28]

56. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[29]

**iv. The Pixels Installed on the Website Transmit Personally Identifiable Information and Protected Health Information to Google and Microsoft.**

57. Every website is hosted by a computer "server" that holds the website's contents.

---

[27] FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC Technology Blog (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking?utm_source=govdelivery.

[28] Darius Tahir & Simon Fondrie-Teitler*, Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, The Markup (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it.

[29] FTC Office of Technology, *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FTC Technology Blog (March 16, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking?utm_source=govdelivery.

58. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

59. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information—the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

60. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as "cookies" on the user's device.[30] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[31] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[32]

---

[30] *What is a web browser?*, Mozilla, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/.
[31] *Id.*
[32] *Id.*

61. When a Google user logs onto their account, their web browser records a Google tracking cookie.[33] This cookie includes a specific line of code that links the web browser to the user's Google account.[34]

62. Google's Pixels use cookies but operate differently than a cookie. Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user. The information can include details about the user, his or her interactions with the website, and information about the user's environment (e.g., type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

63. Simultaneously, the Google Pixels, like those installed on the Website, request identifying information from any Google cookies previously installed on the user's web browser.

64. The Pixels then combine the data received from the browser with the data acquired from the cookie and instruct the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity, via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

65. A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[35] When these users visit a website, like Defendant's Website, that utilizes a Google Pixel, any information collected

---

[33] Cyphers, *supra*, n. 10.
[34] *Id.*
[35] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TechJury (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* United States Census Bureau, https://www.census.gov/popclock/.

by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

66. However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.[36]

67. Google's Pixels, like those on the Website, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

68. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is often unique.[37] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[38] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

69. The UET tag Defendant installed on the Website similarly transmitted Plaintiff's and Class Members' PII to Microsoft by collecting and disclosing users' VIDs (visitor identifiers), which allowed Microsoft to link information associated with a user of the Website with a particular, identifiable individual.

### v. Defendant Disclosed Plaintiff's and Class Members' Sensitive Health Information to Google and Microsoft.

---

[36] *See Client ID vs User ID in Google* Analytics, Glide Ad Agency, https://glideagency.com/client-id-vs-user-id-in-google-analytics/.
[37] Cyphers, *supra* note 10.
[38] *Id*.

70. Plaintiff and Class Members used Defendant's Website to research and access health treatments and services related to health care services. While visiting Defendant's Website, Plaintiff and Class Members each searched for and accessed information regarding available health care services, selected appointment options, and entered or conveyed health-related information—including the type of health care services sought—thereby transmitting protected health information through the Website.

71. Unbeknownst to Plaintiff and Class Members, Defendant intentionally configured the Tracking Tools installed on the Website to intercept and then disclose the Sensitive Health Information and other protected information that they communicated to Defendant through the Website to third parties, including Google and Microsoft.

72. As Figure 1 shows, when a user accesses the Website's "Plan My Visit" urgent care check-in tool, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Website includes the user's Client ID, or CID, as well as their PHI, including that they are reserving their place in line at an urgent care facility for a specific treatment—in this case, diagnostic imaging services.

× Headers **Payload** Preview Response Initiator Timing Cookies

| | |
|---|---|
| en | gtag.config |
| gtm | 45be6bg2v9212559323za208zd9212559323xecxf1 |
| gcd | 13r3r3r3r5l1 |
| dma | 0 |
| tag_exp | 115938466~115938469~118131808~118897920~118897930~119317810~120213116~120385422~120412526~120420416~120469145~120469153~121191153~121246026~121246034~123322202~124320990 |
| u_w | 1470 |
| u_h | 956 |
| url | https://www.totalaccessurgentcare.com/plan-your-visit/ |
| ref | https://www.totalaccessurgentcare.com/what-we-treat/diagnostic-imaging/ |
| rcb | 1 |
| frm | 0 |
| tiba | Urgent Care Check In [Online Tool] \| Total Access Urgent Care |
| did | dMWZhNz |
| gdid | dMWZhNz |
| hn | www.googleadservices.com |
| npa | 0 |
| us_privacy | 1--- |
| pscdl | noapi |
| auid | 1893565470.1794945464 |
| _tu | CA |
| data | event=gtag.config |
| ept | 9 |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |
| cid | CAQS4gEAogo4dQHAFlOCE4KpRLjZtR0hpXIxXDpAuzO-T7BtYnx3w4Lx5sLJfJSvAL5piYKh-FJWsMcnRDqtbebkznEqvFPUUiJXymUbQuBAxplrMR6CrkZRv6_FKs6gjZQ3_9J-2diTKCla3mjcLThXmrrixywIf0l7Nk7s8mLQ-hmv_f3TMNeFw-pTgqsSCv9tkawqosMu6KjLUds0kZNNlbGBrM0cKXTEw3s-z1gUYKPgNq50pF215rbi4WzLzSIIbjDGNRlKoQpdaGYHctMAmIRNQKkGoy-MVmwXJf-CxkrBrdt |
| random | 3147244209 |
| rmt_tld | 0 |
| ipr | y |

**Figure 1.** Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users save their place in line to receive diagnostic imaging services.

73. Figure 2 shows that when a patient is using the Website to search for a Total Access clinic location near a certain address to seek treatment for a particular condition (in this case, COVID-19), Defendant discloses to Google the patient's Client ID, or CID, as well as the full text of the patient's location search query (which may include the patient's home address) and the fact

that the patient is searching for an urgent care location after having visited the Website's page on COVID-19.

X Headers **Payload** Preview Response Initiator Timing Cookies

| | |
|---|---|
| async | 1 |
| en | gtag.config |
| gtm | 45be6bg2v9212559323za208zd9212559323xecxf1 |
| gcd | 13r3r3r3r5l1 |
| dma | 0 |
| tag_exp | 115938466~115938469~118131808~118897920~118897930~119317810~120213116~120385422~120412528~120420416~120469145~120469153~121191153~121246026~121246034~123322202~123785233 |
| u_w | 1470 |
| u_h | 956 |
| url | https://www.totalaccessurgentcare.com/locations/?address=1+North+Broadway%2C+St.+Louis |
| ref | https://www.totalaccessurgentcare.com/covid-19/ |
| rcb | 15 |
| frm | 0 |
| tiba | Urgent Care Clinic Locations \| Total Access Urgent Care |
| did | dMWZhNz |
| gdid | dMWZhNz |
| hn | www.googleadservices.com |
| npa | 0 |
| us_privacy | 1--- |
| pscdl | noapi |
| auid | 1893565470.1794945464 |
| _tu | CA |
| data | event=gtag.config |
| ept | 9 |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |
| cid | CAQS4gEAogo4dVnWIW2ea5freWhhOcrbNB2HV6m1KZBM1vtD_ie0-YBU3WTNV4jpOw8Io1fWfztSg16JOy3afPo_16OaBtrltEjPzoCJ5slR7hb8aLYaDrR72ljj4PfFAK03NC6jNz92NoBmabrALW5pgS3zoiN4DbDEsrSiitC8DZUq-EXZFwe2JFv1Fw83ScGgslcx6PArlGabWjDYJUx52ALKbDpTWvtvZYDAFn39b7qVT9C2SsANBsTgr9bKaqLH0zysqYtrIF-nR5Ab7xVd_LcYeyEH-fIVqTREOOgaYbEikbF9 |
| random | 2926751111 |
| rmt_tld | 0 |
| ipr | y |

**Figure 2.** Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when Website users search for urgent care locations near a particular street address.

74. Figure 3 shows that when a patient performs a search on the Website for a particular medical condition or service, Defendant discloses to Google the patient's Client ID, or CID, as well as the full text of the patient's search—in this case "sexually transmitted disease test."

× Headers Payload Preview Response Initiator Timing Cookies


| | |
|---|---|
| guid | ON |
| async | 1 |
| en | gtag.config |
| gtm | 45be6bh0h2v9212559323za208zd9212559323xecxf1 |
| gcd | 13r3r3r5l1 |
| dma | 0 |
| tag_exp | 115938465~115938468~118012007~118131808~118897920~118897930~119317810~120213116~120385423~120412528~120420416~120469145~120469153~121191153~121246026~121246034~123322202~123785232 |
| u_w | 1470 |
| u_h | 956 |
| url | https://www.totalaccessurgentcare.com/?s=sexually+transmitted+disease+test |
| ref | https://www.totalaccessurgentcare.com/what-we-treat/illness/ |
| rcb | 6 |
| frm | 0 |
| tiba | You searched for sexually transmitted disease test - St. Louis Urgent Care Center \| Total Access Urgent Care |
| did | dMWZhNz |
| gdid | dMWZhNz |
| hn | www.googleadservices.com |
| npa | 0 |
| us_privacy | 1--- |
| pscdl | noapi |
| auid | 1893565470.1794945464 |
| _tu | CA |
| data | event=gtag.config |
| ept | 9 |
| rfmt | 3 |
| fmt | 3 |
| is_vtc | 1 |
| cid | CAQS4gEAogo4dcyO_4D4_cRLlby6sBWVbXn8uSixi8jthWgMioUkz0kd4msBW7gJOuqlyf3jWQEOWymRc7txwSTV2K4JnDm5cu1f3Qtj3SDnEPwCFO-urYZCyZwJ1T8RZZObZNlyUzMr3buB6bDSwfdGoJosX2_4eJT3O-wYbxAedJcWU-fcH417apvOla3PAESEq3iQ03PEV3Nsin5az8jUHJzA7q122VPDNa30xjEAYFFeaRyseFKpo8XTNr7fD-ZhUFXlxRSs1UeBNUWSl1v8QdaG4t2ubzxCkMahTKM3rJ-M5iod |
| random | 1917645930 |
| rmt_tld | 0 |
| ipr | y |


**Figure 3.** Screenshot depicting back-end network traffic from the Website which shows information transmitted to Google when a Website user performs a search.

75. Much of the same information is transmitted to Microsoft as well. Figure 4 shows that when a patient requests to pay their bills for medical treatment, Defendant discloses to Microsoft the patient's Visitor ID, or VID, as well as the fact that the patient is seeking to pay medical bills.



× Headers Payload Preview Response Initiator Timing Cookies

▾Query string parameters View source View URL-encoded

| | |
|---|---|
| ti | 343143054 |
| Ver | 2 |
| mid | 4a20d864-df93-4387-a351-11804e8c5ea1 |
| bo | 2 |
| sid | 2729b330e2c111f1b27a7d6ffefbddfa |
| vid | 2729ceb0e2c111f1804d25d156e1623a |
| vids | 0 |
| msclkid | N |
| pi | 918639831 |
| lg | en-US |
| sw | 1470 |
| sh | 956 |
| sc | 30 |
| tl | Pay Your Urgent Care Bill \| Total Access Urgent Care |
| p | https://www.totalaccessurgentcare.com/plan-your-visit/pay-your-bills/ |
| r | https://www.totalaccessurgentcare.com/ |
| lt | 524 |
| evt | pageLoad |
| sv | 2 |
| asc | G |
| cdb | AQIR |
| rn | 332725 |

**Figure 4.** Screenshot depicting back-end network traffic from the Website which shows information transmitted to Microsoft when the user pays medical bills through the Website.

76. As mentioned above, the information that was transmitted to Google and Microsoft was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff and Class Members to their identities. The Google Pixel on the Website transmitted the identifier numbers attached to Google's 'cid' cookie, which can be used to identify the user's

Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

77. Defendant also caused users' health-related communications to be transmitted directly to Google's advertising audience-list endpoint on the google.com domain. Counsel's examination of the Website using a browser signed into a Google account showed that a request to that endpoint contained the user's health-related search terms in the page URL and title, an advertising identifier, and Google account session cookies. Those cookies included __Secure-3PSID, __Secure-3PAPISID, __Secure-3PSIDCC, __Secure-3PSIDTS, and __Secure-3PSIDRTS. Google thus received the health-related communication and the cookies associated with the signed-in account in the same request, permitting Google to associate the communication with that account.

78. Defendant configured its Google advertising tags to transmit users' health-related page URLs, page titles, and search terms to Google's remarketing and advertising audience-list endpoints. Those requests identified Defendant's Google Ads account and included persistent user identifiers. Defendant used these transmissions to create advertising audiences, associate website activity with its advertising campaigns, and reach users who had researched its medical services or sought care through the Website. Defendant thereby obtained advertising benefits from the same confidential communications that patients provided while seeking medical information and treatment.

## B. DEFENDANT DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT.

### i. Defendant Failed to Inform Plaintiff and Class Members of its Disclosure of their Sensitive Health Information.

79. Defendant breached Plaintiff's and Class Members' right to privacy by unlawfully disclosing their Sensitive Health Information to third parties, including Google and Microsoft.

80. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy. Defendant did not inform Plaintiff that it was sharing her Sensitive Health Information with third parties, including Google or Microsoft.

81. In fact, Defendant affirmatively misled users of the Website about how their Sensitive Health Information would be treated. Defendant represents to its patients in its Privacy Policy that "[y]our privacy is very important to us, and the following will inform you of the information that we, Total Access Urgent Care, may collect from you, and how it is used."[39] However, Defendant does not live up to this representation.

82. The Website contains a Privacy Policy in which Defendant repeatedly reassures patients that no personally identifying information is collected or shared with third parties. For example, Defendant represents in the Privacy Policy:

> We may collect non-personal information, such as a domain name and IP Address. The domain name and IP address reveals nothing personal about you other than the IP address from which you have accessed our site.[40]

---

[39] https://www.totalaccessurgentcare.com/privacy-policy/
[40] https://www.totalaccessurgentcare.com/privacy-policy/

83. Defendant goes even further, acknowledging that it uses cookies on the Website but affirmatively promising that such usage of cookies does not implicate users' PII:

> We use "cookies" on this site. A cookie is a piece of data stored on a site visitor's hard drive to help us improve your access to our site and identify repeat visitors to our site. For instance, when we use a cookie to identify you, you would not have to log in a password more than once, thereby saving time while on our site. Cookies can also enable us to track and target the interests of our users to enhance the experience on our site. **Usage of a cookie is in no way linked to any personally identifiable information on our site**.[41]

84. Defendant also affirmatively represents to its users that it will not share the information collected through the Website with third parties except in limited circumstances. The Privacy Policy states, "We use the collected information primarily for our own internal purposes, such as providing, maintaining, evaluating, and improving our services and Website, fulfilling requests for information, and providing customer support."

85. Under the heading "Sharing," the Privacy Policy states, "We will not sell or otherwise provide the information we collect to outside third parties for the purpose of direct or indirect mass email marketing." The Privacy Policy then lists the specific circumstances under which Total Access "will disclose personal information and/or an IP address." These circumstances are limited to "when required by law or in the good-faith belief that such action is necessary to":

- Cooperate with the investigations of purported unlawful activities and conform to the edicts of the law or comply with legal process served on our company
- Protect and defend the rights or property of our Website and related properties
- Identify persons who may be violating the law, the rights of third parties, or otherwise misusing our Website or its related properties

---

[41] *Id.*

86. Plaintiff and Class Members never gave written authorization for Defendant to use or disclose their Sensitive Health Information for marketing or for any other use or disclosure not described in the Privacy Policy.

87. However, in direct contravention of Defendant's explicit promises, Defendant configured the Tracking Tools in order to collect PII, including the Google Pixels' collection of users' CIDs and the Microsoft UET tag's collection of users' VIDs.

88. Neither the Privacy Policy nor any other disclosure on the Website did or could have apprised users of Defendant's use of the Tracking Tools to collect and disclose their Sensitive Health Information. Accordingly, neither Plaintiff nor any Class Member consented to the use of the Tracking Tools to collect and disclose their Sensitive Health Information to third parties including Google and Microsoft.

89. By engaging in this improper sharing of information without Plaintiff's and Class Members' consent, Defendant violated its own Privacy Policy, breached Plaintiff's and Class Members' right to privacy, and unlawfully disclosed their Sensitive Health Information.

90. Despite never telling users like Plaintiff and Class Members or obtaining their consent, Defendant allowed third parties such as Google and Microsoft to intercept Plaintiff's and Class Members' Sensitive Health Information and use it for advertising purposes.

**ii. The Tracking Tools Used by Defendant Were Imperceptible to Plaintiff and Class Members.**

91. The Tracking Tools installed on the Website were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Website through examination of its source code or the use of sophisticated web developer tools, there was no way

for a Website user to discover the presence of the Tracking Tools. As a result, typical internet users such as Plaintiff and Class Members were unable to detect the Tracking Tools on the Website.

92. Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

93. Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

94. Because Plaintiff and Class Members were not aware of the Tracking Tools on the Website, or that their Sensitive Health Information would be collected and transmitted to Google and Microsoft, they could not and did not consent to Defendant's conduct.

## C. DEFENDANT WAS ENRICHED BY ITS DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES.

### i. Defendant Received Material Benefits in Exchange for Plaintiff's Sensitive Health Information.

95. As explained, *supra*, users of Google's Business Tools and Microsoft's advertising network, like Defendant, receive access to advertising and marketing analytics services in exchange for installing the Tracking Tools on their websites.

96. Upon information and good faith belief, Defendant, as a user of Google's Business Tools and Microsoft's advertising network, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google and Microsoft to collect Plaintiff's and Class Members' Sensitive Health Information.

**ii. Plaintiff's and Class Members' Data Had Financial Value.**

97. Plaintiff's and Class Members' Sensitive Health Information has value, and Defendant's disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

98. According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[42]

99. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

100. Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[43] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[44]

---

[42] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, The Washington Post (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/.

[43] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[44] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available online at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

101. Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

102. The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm to Plaintiff and Class Members.

## D. DEFENDANT'S USE OF THE TRACKING TOOLS VIOLATES HIPAA.

103. The disclosure of Plaintiff's and Class Members' Sensitive Health Information via the Tracking Tools contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Sensitive Health Information.

104. The HIPAA Privacy Rule sets forth policies to protect all IIHI that is held or transmitted by a covered entity such as Defendant. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes PHI.

105. While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

106. Simply put, further to the HIPAA Privacy Rule, covered entities such as Defendant are simply ***not*** permitted to use tracking technology tools in a way that exposes Sensitive Health Information to any third party without express and informed consent.

107. Under federal law, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[45]

108. The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103.

109. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103.

110. Under the HIPAA de-identification rule, health information is not considered individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "document[ed] the methods and results of the analysis that justify such determination." Or, (2), if all enumerated identifiers of the individual or their family members are removed, including names, medical record numbers, account numbers, device identifiers, device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number, characteristic, or code," so that the entity does not "have actual knowledge that the information could be used alone

---

[45] HIPAA, 42 U.S.C. § 1320d *et seq.*; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

or in combination with other information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514.

111. The HIPAA Privacy Rule requires any "covered entity"—which includes healthcare providers like Defendant—to maintain appropriate safeguards to protect the privacy of PHI and set limits and conditions on the uses and disclosures that may be made of PHI without authorization. 45 C.F.R. §§ 160.103, 164.502.

112. Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a particular entity, can be PHI.

113. The U.S. Department of Health and Human Services ("HHS") has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[46]

114. Consistent with this restriction, the HHS has issued marketing guidance that provides, "[w]ith limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list."[47]

115. Here, Defendant provided PHI to third parties in violation of the Privacy Rule.

---

[46] *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.
[47] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

116. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(c), and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

117. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. § 164.308(a)(1);

c. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

d. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to IIHI in violation of 45 C.F.R. § 164.306(a)(3);

e. Failing to effectively train its workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

f. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

118. In its Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, HHS instructed in 2012:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[48]

119. In its Guidance regarding Marketing, HHS further instructed in 2003:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[49]

120. HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

a. "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

b. "A covered entity must have the individual's prior written

---

[48] *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html.
[49] *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html.

authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

c. It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

121. In other words, HHS has expressly stated that Defendant's conduct violates HIPAA Rules by implementing the Tracking Tools.

## E. PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY.

122. At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendant, they each had a reasonable expectation that the information would remain confidential and that Defendant would not share the Sensitive Health Information with third parties for a commercial purpose unrelated to providing them with medical care.

123. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

124. For example, a Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[50]

[50] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, Consumer Reports (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907.

125. And, in a study performed by the National Institutes of Health, nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[51]

126. Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

## TOLLING AND ESTOPPEL

127. Any applicable statutes of limitation have been tolled by Defendant's knowing and active concealment of the incorporation of the Tracking Tools onto the Website.

128. The Tracking Tools on the Website were and are invisible to the average website visitor.

129. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

130. Plaintiff and Class Members were ignorant of the information essential to pursue their claims, without any fault or lack of diligence on their part.

131. Defendant had exclusive knowledge that the Website incorporated the Pixels and other Tracking Tools and yet failed to disclose to users, including Plaintiff and Class Members, that by using the Website to make appointments and search for information regarding Defendant's health care services, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google and Microsoft.

---

[51] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH SERV. RES. (2011), *available online at* https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

132. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its users' Sensitive Health Information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

133. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

134. The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendant's conduct would have been November 2026, shortly before the filing of this Complaint.

## CLASS ALLEGATIONS

135. This action is brought by the named Plaintiff on her behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

136. The Nationwide Class that Plaintiff seeks to represent is defined, as follows:

> For the fullest period allowed by law, all patients in the United States who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Microsoft, or any other unauthorized third party.

137. The Missouri Subclass that Plaintiff seeks to represent is defined as:

> For the fullest period allowed by law, all current Missouri residents who used the Website, and whose Sensitive Health Information was disclosed or transmitted to Google, Microsoft, or any other unauthorized third party.

138. Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

139. Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

140. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Defendant operates 27 urgent care clinics. As such, at least 100—and likely many more—patients and other Website users have been impacted by Defendant's actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendant.

141. **Commonality.** Common questions of law or fact arising from Defendant's conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendant had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b) Whether Defendant had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c) Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d) Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e) Whether Defendant adequately addressed and fixed the practices which permitted the unauthorized disclosure of users' Sensitive Health Information;

f) Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g) Whether Defendant violated the statutes asserted as claims in this Complaint;

h) Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendant's wrongful conduct;

i) Whether Defendant knowingly omitted material representations with respect to its data security and/or privacy practices; and

j) Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendant's disclosure of their Sensitive Health Information.

142. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendant's incorporation and use of the Tracking Tools.

143. **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff

has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

144. **Predominance**. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google and Microsoft, in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

145. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

146. Defendant acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

147. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which

would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b) Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c) Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendant's wrongful conduct.

148. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to the names of each Class Member—each of whom visited Defendant's Website to research information about their health conditions, reserve their place in line, or otherwise access Defendant's health care services—affected by the unauthorized disclosures that have taken place.

## COUNT I

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Class)***

149. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

150. The ECPA protects both sending and receipt of communications.

151. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

152. The transmissions of Plaintiff's Sensitive Health Information to the Website qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

153. Electronic Communications. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

154. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

155. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or

other device" and "contents . . . include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

156. Electronic, Mechanical, or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiff's and Class Members' browsers;

b. Plaintiff's and Class Members' computing devices;

c. Defendant's web-servers; and

d. The Pixel code deployed by Defendant to effectuate the sending and acquisition of Website user communications.

157. By utilizing and embedding the Pixels and Tracking Tools on the Website, Defendant intentionally intercepted, endeavored to intercept, and procured another person to intercept, the content of the electronic communications of Plaintiff and Class Members, in transmission, in violation of 18 U.S.C. § 2511(1)(a).

158. Specifically, Defendant intercepted Plaintiff's and Class Members' electronic communications, while the communication was in transmission, via the Pixels and Tracking Tools, and then tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Sensitive Health Information to third parties such as Google and Microsoft.

159. Defendant's intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including information related to health care treatment and diagnosis.

160. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

161. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

162. Unauthorized Purpose. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy—and the criminal violation of HIPAA, among others.

163. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

164. Defendant is not a party to the communication based on its unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendant is a party, Defendant's interception and disclosure of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

165. Defendant's acquisition of sensitive communications, through the deliberate installation and configuration of the Tracking Tools on the Website, and disclosure of those communications to Google and Microsoft was done for purposes of committing criminal and

tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Negligence;

c. Intrusion upon seclusion;

d. Breach of fiduciary duty of confidence; and

e. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3).

166. Defendant's conduct violated 42 U.S.C. § 1320d-6 in that it knowingly disclosed individually identifiable health information to Google and Microsoft, including that of Plaintiff and Class Members, without user authorization.

167. Defendant is not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the ground that it was a participant in Plaintiff's and Class Members' communications about their Sensitive Health Information on the Website, because it used its participation in these communications to improperly share Plaintiff's and Class Members' Sensitive Health Information with Google, Microsoft, and other third parties that did not participate in these communications, that Plaintiff and Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff and Class Members did not consent to receive their Sensitive Health Information.

168. As such, Defendant cannot viably claim any exception to ECPA liability.

169. Plaintiff and Class Members have suffered damages as a direct and proximate result of Defendant's invasion of privacy in that:

a. Learning that Defendant has intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendant received substantial financial benefits from its use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendant received substantial, quantifiable value from its use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Website and determining what ads people see on the Website, without providing any value or benefit to Plaintiff or Class Members;

d. Defendant failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendant making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

170. Defendant intentionally used the wire or electronic communications to increase its profit margins. Defendant specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

171. Defendant was not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

172. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading their privacy via the Tracking Tools.

173. Any purported consent that Defendant may claim it received from Plaintiff and Class Members was not valid.

174. In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Website, Defendant's purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

175. As a result of Defendant's violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorneys' fees and costs.

**COUNT II**

**NEGLIGENCE**
***(On Behalf of Plaintiff and the Missouri Subclass)***

176. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

177. Through their use of the Website, Plaintiff and the Class Members provided Defendant with their Sensitive Health Information, believing such information would be kept confidential.

178. By collecting and storing this data, Defendant had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

179. Defendant's duty also arose from its provider-patient relationship with Plaintiff and Missouri Subclass members. Defendant invited patients to communicate through the Website concerning their medical needs and to use the Website to access its treatment services. Having

received confidential patient information through that relationship, Defendant owed a duty to exercise reasonable care to preserve its confidentiality and prevent unauthorized disclosure. Missouri recognizes a fiduciary duty of confidentiality concerning medical information received in connection with a patient's treatment.

180. Defendant negligently failed to take reasonable steps to protect Plaintiff's and the Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google and Microsoft.

181. Defendant further negligently omitted to inform Plaintiff and the Class Members that it would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

182. Defendant knew, or reasonably should have known, that Plaintiff and the Class Members would not have provided their Sensitive Health Information to Defendant had they known that Defendant intended to use that information for unlawful purposes.

183. Defendant's conduct has caused Plaintiff and the Class Members to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

184. Plaintiff and the Class Members are entitled to compensatory, nominal, and/or punitive damages.

185. Defendant's negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and the Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief.

## COUNT III

### INTRUSION UPON SECLUSION
***(On Behalf of Plaintiff and the Missouri Subclass)***

186. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

187. Plaintiff and Missouri Subclass members had an objectively reasonable expectation of privacy and seclusion in their communications with the Website concerning their medical conditions, treatments, doctors, and other Sensitive Health Information they provided to Defendant through the Website. They made those communications solely to Defendant, on a Website that provided no notice of, and no opportunity to consent to, the disclosure of that data in the form described herein. No reasonable patient or prospective patient would expect that a health care provider was disclosing those communications to third-party advertising, search, retargeting, and marketing companies, including Google and Microsoft.

188. Defendant created the means by which advertising companies obtained access to communications that users directed to their medical provider. Defendant selected and deployed the Tracking Tools on the Website and caused users' browsers to transmit their health-related communications together with identifying information. Plaintiff and Missouri Subclass members had no reason to understand that researching treatment, selecting a clinic, or seeking an appointment would expose those communications to advertising companies. The intrusion compromised the confidentiality patients reasonably expected when communicating with Defendant about their medical care.

189. Defendant intentionally intruded upon that seclusion. Defendant deliberately selected, installed, and configured the Tracking Tools to capture Plaintiff's and the Missouri

Subclass members' communications with the Website as they were made and to transmit them, together with persistent identifiers that identify the user, to Google, Microsoft, and other third parties, without Plaintiff's or the Missouri Subclass members' knowledge or consent.

190. Defendant's intrusion was highly offensive to a reasonable person. The degree of the intrusion was total: it captured every page visited, every condition or treatment searched for, and every treatment location from which users sought treatment. Defendant accomplished its intrusion surreptitiously through code that was invisible to the end user.

191. As a direct and proximate result of Defendant's intrusion, Plaintiff and Missouri Subclass members suffered injury, including the loss of privacy in their health-related and identifying information, mental anguish and distress, and the loss of the value of their personal and health-related information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

## COUNT IV

## UNJUST ENRICHMENT
***(On Behalf of Plaintiff and the Missouri Subclass)***

192. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

193. Plaintiff and the Class Members conferred a monetary benefit on Defendant in exchange for information and services related to health care services. Specifically, they provided their Sensitive Health Information to Defendant which Defendant then utilized for marketing and advertising purposes, as described, *supra*.

194. Defendant knew that Plaintiff and the Class Members conferred a benefit upon Defendant, which Defendant accepted. Defendant profited from the Sensitive Health Information of Plaintiff and the Class Members by exchanging it for marketing and advertising services.

195. In particular, Defendant enriched itself by obtaining the inherent value of Plaintiff's and the Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and the Class Members' Sensitive Health Information.

196. Plaintiff and the Class Members, on the other hand, suffered as a direct and proximate result of Defendant's decision to prioritize its own profits over the privacy of its users' Sensitive Health Information.

197. Under the principles of equity and good conscience, Defendant should not be permitted to retain such benefits obtained by its surreptitious collection and transmission of Plaintiff's and the Class Members' Sensitive Health Information.

198. If Plaintiff and the Class Members knew that Defendant would disclose their Sensitive Health Information to third parties such as Google and Microsoft, they would not have agreed to provide their Sensitive Health Information to Defendant.

199. In addition, Plaintiff and the Class Members would not have provided their Sensitive Health Information to Defendant through the Website if not for Defendant's false and misleading statements in the Privacy Policy.

200. Plaintiff and the Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

201. As a direct and proximate result of Defendant's conduct, Plaintiff and the Class Members have suffered and will continue to suffer injury.

202. Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and the Class Members, proceeds that it unjustly received from them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendant's services.

## COUNT V

## BREACH OF FIDUCIARY DUTY OF CONFIDENCE
***(On Behalf of Plaintiff and the Missouri Subclass)***

203. Plaintiff repeats and realleges the allegations contained in the foregoing paragraphs as if fully set forth herein.

204. Plaintiff and the Class Members, on the one hand, and Defendant, on the other hand, have a patient-physician relationship.

205. Defendant owes to Plaintiff and the Class Members a fiduciary duty of confidentiality not to disclose any medical information received in connection with the treatment of Plaintiff and the Class members.

206. Defendant received Sensitive Health Information regarding Plaintiff and the Class Members in connection with Defendant's medical treatment of Plaintiff and the Class Members as patients.

207. Defendant disclosed this Sensitive Health Information to third parties, including Google and Microsoft, without Plaintiff's and the Class Members' consent.

208. Plaintiff and the Class Members never waived their right to confidentiality with respect to the Sensitive Health Information that Defendant disclosed.

209. As a direct and proximate result of Defendant's breach, Plaintiff and Missouri Subclass members suffered injury, including the loss of privacy in their health-related and identifying information, mental anguish and distress, and the loss of the value of their personal and

health-related information, and are entitled to compensatory damages, punitive damages for Defendant's willful and wanton conduct, and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendant as follows:

A. an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B. equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C. injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded; and

G. all such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of herself and the putative Class, hereby demands a trial by jury on all issues so triable.

Dated: November 20, 2026

Respectfully submitted,

*/s/ Nicholas C. Coyle*
Nicholas C. Coyle #73669(MO)
Matthew J. Langley*
**ALMEIDA LAW GROUP LLC**
nick@almeidalawgroup.com
matt@almeidalawgroup.com
849 W. Webster Avenue
Chicago, Illinois 60614
Telephone: (773) 554-9354

(**pro hac vice* forthcoming)

*Counsel for Plaintiff and the Putative Class*